# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

August 12, 2009

Charles R. Fulbruge III
Clerk

No. 08-10603

LAWRENCE FRAKES

Plaintiff-Appellant

v.

CRETE CARRIER CORPORATION

Defendant-Appellee

Appeal from the United States District Court
for the Northern District of Texas

Before WIENER, GARZA, and ELROD, Circuit Judges.

EMILIO M. GARZA, Circuit Judge:

In this diversity case, plaintiff Lawrence Frakes ("Frakes") filed suit for slander against his former employer, Crete Carrier Corporation ("Crete"). The district court granted Crete's motion for summary judgment, finding that the defamatory statement alleged by Frakes was subject to a qualified privilege under Texas law. Frakes now appeals. For the following reasons, we affirm the judgment of the district court.

## I

Crete is a trucking company based in Nebraska. In 2006, Crete hired Frakes to work as a night-shift mechanic in its facility in Wilmer, Texas (the "Wilmer facility"). Around one year later, Crete terminated Frakes for allegedly

stealing diesel fuel from a company tractor, resulting in the instant litigation. Because the facts of Frakes' dismissal are significant, they are recounted in some detail:

On the evening of the alleged fuel theft, Frakes drove to work in his standard vehicle—a white Dodge Ram diesel-fuel pickup with an auxiliary fuel tank affixed to the back. Although the Wilmer facility had assigned parking for employees, Frakes parked directly behind the mechanics' shop in an area reserved for company tractors in need of repair. Frakes clocked in for his shift around 3:00 p.m.

Around 8:30 to 9:00 p.m. that night, Crete driver Ignatius Edoh ("Edoh") arrived at the Wilmer facility in order to load supplies into his company tractor for a trip that evening. According to Edoh, as he approached his assigned tractor, he observed "a white pickup truck parked very close to [the tractor] on the left side." A man dressed in a mechanic's uniform immediately approached Edoh and asked "can I help you?" Edoh responded "that's my tractor," and the man replied "oh, I'll get my truck out of the way for you." At this point, the unidentified man walked away, and Edoh left his personal vehicle to inspect the situation. While walking around the scene, Edoh noticed a fuel storage tank in the back of the white pickup with a running motorized siphon attached to a hose. Edoh observed that the hose ran from the back of the white pickup, around the front of his assigned tractor, and into the fuel tank of the adjacent tractor. Edoh asked the man if he was "supposed to be doing this," and the man responded affirmatively.

Remaining suspicious, Edoh recorded the license-plate number of the white pickup and left to report the incident to the night foreman on duty, Joe Labellarte ("Labellarte"). Edoh told Labellarte that someone might be stealing fuel from one of the tractors but that Edoh did not recognize the man involved. Several minutes later, Labellarte joined Edoh at the scene of the incident, where

the white pickup had been moved 30 to 40 feet away from the tractors and the man had disappeared. Edoh confirmed that the white pickup was the same vehicle that he had seen earlier, and Labellarte immediately recognized the pickup as Frakes' Dodge Ram truck.

Labellarte then returned to his office and called the shop manager, Pat Sedivy ("Sedivy"), at his home. Sedivy instructed Labellarte to make a diagram of the scene, check whether there was fresh diesel around the fuel caps of the two involved tractors, confirm whether the hose in Frakes' truck was long enough to reach the tractors, and check whether there was fresh diesel on the end of the hose. After performing a brief investigation, Labellarte again called Sedivy and confirmed the length of the hose and the existence of wet diesel around the hose and the caps of the two tractors.

The following day, Sedivy arrived at the Wilmer facility and spoke to Edoh over the phone. Edoh reiterated the events of the preceding night and stated that he had not recognized the man in the mechanic's uniform.[1] He also stated his belief that diesel had been stolen from his tractor based on his fuel level from the preceding evening. When Frakes arrived for his evening shift at 3:00 p.m., Sedivy asked him to come to Sedivy's office. Sedivy told Frakes that an eyewitness had seen him take fuel from a company tractor and asked for a response. Frakes flatly denied the theft and asked to speak to the eyewitness. Sedivy then asked Frakes why he had parked his pickup in the area designated for company tractors, and Frakes responded that there had been nowhere else to park. Unsatisfied with these responses, Sedivy terminated Frakes' employment without further investigation.

By that evening, the news that Frakes had been terminated for fuel theft was common knowledge at the Wilmer facility, providing the impetus for the

---

[1] To date, Edoh has never identified anyone for the alleged theft. His testimony reflects that he has never met or seen Lawrence Frakes.

instant defamation suit. According to Frakes' version of events, the news became widespread because Sedivy told Paul Gann ("Gann"), a "lead man" mechanic and close friend of Frakes, that Frakes had been fired for stealing fuel. Gann then repeated the theft allegation to various other employees at the Wilmer facility.

Frakes filed suit against Crete in federal district court, raising claims of slander under Texas law. Specifically, Frakes alleged that Sedivy's statement to Gann was false, defamatory, and attributable to Crete.[2] Crete moved for summary judgment, arguing, *inter alia*, that Sedivy's statement to Gann was (1) true or substantially true and (2) subject to a qualified privilege for employer communications under Texas law. The district court granted summary judgment on the basis of qualified privilege and did not reach the truth of the theft allegation against Frakes.[3] Frakes now appeals, arguing that the district court erred in its application of the qualified privilege.

## II

We review a grant of summary judgment *de novo*, applying the same standards as the district court. *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 391 (5th Cir. 2009). Summary judgment is appropriate where the record demonstrates "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). "A genuine issue of material fact exists if the evidence is such that a reasonable

---

[2] For purposes of summary judgment, the parties agreed that Sedivy's statement to Gann—but *not* Gann's subsequent republication of the statement to other employees—was attributable to Crete with regard to defamation liability. *See Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 647 (Tex. 1995) (explaining that an employer is not liable for an employee's statements made outside of the scope of the particular employee's authority).

[3] The parties continue to dispute who actually stole the fuel. Crete contends that the circumstantial evidence overwhelmingly indicates Frakes' involvement. Frakes responds that he was the victim of a rather elaborate set up. However, as the district court did not base its decision on the truth of the charges, we need not resolve this dispute here.

jury could return a verdict for the non-moving party." *Paz*, 555 F.3d at 391 (internal quotation marks and citations omitted). In reviewing the entire record, we consider "all evidence in a light most favorable to the non-moving party and draw[] all reasonable inferences in favor of the non-moving party." *Id*.

## III

Under Texas law, a qualified privilege extends to any communication by an employer about an employee made to a person having a corresponding interest or duty in the subject matter of the communication. *Burch v. Coca-Cola Co.,* 119 F.3d 305, 323 (5th Cir. 1997). Generally, this qualified privilege acts as a complete defense to a claim of defamation unless the employer's statement is made with "actual malice" or the privilege is abused. *See id.*; *Randall's Food Mkts., Inc. v. Johnson*, 891 S.W.2d 640, 646 (Tex. 1995).

The district court dismissed Frakes' claim of slander on the basis of this qualified privilege. Frakes now contends that summary judgment was improper because (1) Sedivy's statement to Gann was not subject to the qualified privilege; (2) the statement was made with actual malice, thereby defeating any claim of privilege; and (3) Crete lost the benefit of the privilege after Gann repeated the allegations to his fellow employees. We consider each allegation in turn.

## A

Frakes first contends that summary judgment was improper because Sedivy's statement was not subject to a qualified privilege, as Gann had no "interest or duty" in the *reason* for Frakes' termination. "Whether a conditional or qualified privilege exists is a question of law for the court." *E. Tex. Med. Ctr. Cancer Inst. v. Anderson*, 991 S.W.2d 55, 60 (Tex. App.—Tyler 1998, pet. denied); *see Dollar v. Georgia-Pacific Corp.*, 59 F.3d 1242, 1995 WL 413067, *2 (5th Cir. 1995) (unpublished).

Under Texas law, a qualified privilege extends to all "[a]ccusations or comments about an employee by his employer, made to a person having *an*

*interest or duty in the matter* to which the communication relates . . . ." *Burch*, 119 F.3d at 323 (emphasis added). Based on the undisputed facts, Gann clearly had an interest in the reason for Frakes' termination based on Gann's position at the Wilmer facility. On the day of Frakes' dismissal, Gann was working as a "lead man"—an experienced mechanic responsible for monitoring and assisting other mechanics, including the mechanics in Frakes' assigned area. Frakes has provided no authority to support the proposition that a supervisory employee such as Gann lacks a sufficient interest in the reason for a subordinate's termination,[4] and we decline to endorse such a narrow interpretation of the qualified-privilege rule. *See Ehrhardt v. Elec. & Instrumentation Unlimited of La.*, 220 F.Supp.2d 649, 659 (E.D. Tex. 2002) (finding that an employer's statement to "individuals who worked directly with [the plaintiff]" was protected by the privilege). Accordingly, the district court did not err in finding Sedivy's communication subject to a qualified privilege under Texas law.

**B**

Frakes next contends that summary judgment was improper because Sedivy's statement was made with actual malice. The presence of actual malice defeats an employer's qualified privilege. *See Burch*, 119 F.3d at 323. At the summary-judgment stage, the plaintiff has the burden to put forth sufficient evidence to create a genuine dispute as to the existence of actual malice. *Duffy v. Leading Edge Prods., Inc.*, 44 F.3d 308, 313–14 (5th Cir. 1995).

Under Texas law, "a statement is made with actual malice when the statement is made with knowledge of its falsity or with reckless disregard as to

---

[4] Indeed, as noted by the district court, there are several obvious reasons for a supervisor such as Gann to know the basis for an employee's termination, including the need to quell office gossip and unrest, to monitor other employees for similar misconduct, and to interact appropriately with the terminated employee in the event of a subsequent confrontation.

its truth." *Randall's*, 891 S.W.2d at 646. As the Supreme Court of Texas has explained:

> Knowledge of falsehood is a relatively clear standard; reckless disregard is much less so. Reckless disregard . . . is a subjective standard that focus[es] on the conduct and state of mind of the defendant. It requires more than a departure from reasonably prudent conduct. Mere negligence is not enough. There must be evidence that the defendant *in fact entertained serious doubts* as to the truth of his publication, evidence that the defendant *actually had a high degree of awareness of . . .* [the] probable falsity of his statements.

*Bentley v. Bunton*, 94 S.W.3d 561, 591 (Tex. 2002) (internal citations and quotation marks omitted; emphases added). Accordingly, the crux of the actual-malice inquiry is whether the defendant subjectively has "significant doubt about the truth of his statements at the time they are made." *Id.* at 596. "A lack of care or an injurious motive in making a statement is not alone proof of actual malice . . . ." *Id.*

Here, Frakes contends that there is sufficient evidence of actual malice to preclude summary judgment. Frakes first argues that Crete's investigation into the fuel theft demonstrated a "purposeful avoidance of the truth." *See id.* ("A failure to investigate fully is not evidence of actual malice; a purposeful avoidance of the truth is."). Specifically, Frakes faults Crete for (1) failing to require Edoh to identify Frakes in person, (2) declining to interview the other mechanics in the shop about the incident, and (3) failing to check inside Frakes' auxiliary gas tank for the presence of fuel.

These arguments lack merit. To succeed on a purposeful-avoidance theory, a plaintiff must show more than negligence; there must be some evidence of a deliberate attempt to avoid a suspected truth. *See Hearst Corp. v. Skeen*, 159 S.W.3d 633, 638 (Tex. 2005). For example, in *Harte-Hanks Comms. v. Connaughton*, the Supreme Court found actual malice where a newspaper refused to investigate a source's allegation even though (1) five other witnesses

disputed the allegation, (2) the source had a known bias, and (3) specific facts known to the newspaper rendered the allegation "highly improbable." 491 U.S. 657, 691 (1989). Similarly, the Supreme Court of Texas found evidence of actual malice where a talk-show host "deliberately ignored" those who could disprove his allegations of corruption even while admitting privately that he "really couldn't get anything on [the plaintiff]." *Bentley*, 94 S.W.3d at 601–02.

In this case, there is simply no similar indication that Crete deliberately ignored contrary evidence or otherwise sought to avoid the truth. Crete engaged in a prompt investigation, and the resulting circumstantial evidence strongly indicated that Frakes was responsible for the theft. Frakes has identified no contrary evidence that should have alerted Crete as to the probable falsity of the charge or the definitive need for further investigation.[5] *See Harte-Hanks*, 491 U.S. at 691. At best, Frakes has alleged only that Crete's investigation was inadequate and potentially negligent, which is insufficient to support a finding of actual malice. *See Burch*, 119 F.3d at 324 n.20; *Hearst*, 159 S.W.3d at 637–38.

Frakes next asserts that Crete exhibited actual malice because Sedivy "doctored" the evidence against Frakes. Specifically, Frakes contends that Sedivy (1) omitted the fact that Edoh could not identify Frakes from his initial report; (2) falsely reported that Gann learned of the theft charge from Frakes instead of himself; (3) falsely testified about having a second phone conversation with Labellarte on the night of the theft; and (4) backdated a subsequent report on the incident. Even if we accept these disputed allegations as true, they do not give rise to the inference that Sedivy "actually had a high degree of awareness of . . . [the] probable falsity" of the charges against Frakes. *See Bentley*, 94

---

[5] We note that, even with the benefit of hindsight, Frakes has failed to demonstrate that any of the alleged deficiencies in the investigation resulted in the exclusion of exculpatory evidence. *Compare Harte-Hanks*, 491 U.S. at 691. For example, none of the other mechanics on duty have provided a clear alibi for Frakes, and there is no evidence that Edoh would have exonerated Frakes as the culprit.

S.W.3d at 591. At best, the allegations suggest that Sedivy was dishonest in his attempt to solidify the case against Frakes or prevail in the current litigation. Standing alone, this does not create a fact issue as to actual malice, as it does not suggest that Sedivy himself doubted the charges against Frakes. *See id.*

Viewing the record as a whole, we find no basis to support a finding of actual malice. It is undisputed that Crete engaged in an investigation that resulted in evidence implicating Frakes. Although Frakes clearly wishes that Crete would have done more, his conclusory allegations as to Sedivy's motivations are insufficient to create a fact issue with regard to actual malice. Where, as here, an employer performs an investigation that leads to circumstantial evidence of guilt, and there is no indication that the employer in fact doubts the truth of the charge, no finding of actual malice is possible. *See Duffy*, 44 F.3d at 314; *Randall's*, 891 S.W.2d at 647.

## C

Finally, Frakes contends that, even if Sedivy's initial statement was protected by a qualified privilege under Texas law, Crete lost the protection of the privilege once Gann repeated the theft allegation to others. We disagree.

At the outset, we reiterate that Frakes does not allege that Crete is directly liable for Gann's republication of the theft allegation to his co-workers. Rather, Frakes contends that Crete lost the benefit of the qualified privilege with regard to Sedivy's initial statement as a result of Gann's subsequent republication.

To support this argument, Frakes relies on a somewhat novel theory of "negligent communication." Texas intermediate courts have at times applied the negligent-communication rule, which is summarized in the Restatement of Torts:

> If a reasonable person would recognize that an act creates an unreasonable risk that the defamatory matter will be communicated

9

> to a third person, the conduct becomes a negligent communication. A negligent communication amounts to a publication just as effectively as an intentional communication.

RESTATEMENT (SECOND) OF TORTS § 577, cmt. k (1977). According to Frakes, Sedivy's initial communication to Gann was "negligent" because Sedivy should have known that, absent an instruction to keep the matter confidential, there was an "unreasonable risk" that Gann would communicate the theft allegation to his friends and fellow mechanics. Accordingly, Frakes concludes that Gann's republication is attributable to Sedivy as a "negligent communication," thereby defeating any privilege with regard to Sedivy's initial statement.

Frakes' interpretation of § 577 finds no support in the Texas case law. Texas courts have generally applied the negligent-publication rule to a particular situation—specifically, one in which the defendant performs some act that creates an unreasonable risk that a defamatory statement will be communicated *through the act itself*. For example, a negligent communication was found where "the act itself of disqualifying the grand champion steer of the Galveston County Fair and Rodeo would create a risk that such disqualification would be communicated to third parties." *See Galveston County Fair & Rodeo, Inc. v. Glover*, 880 S.W.2d 112, 119–120 (Tex. App.—Texarkana 1994, writ denied). Similarly, the act of filing a bond claim was held to constitute a negligent communication because the existence of such a claim would be "a natural inquiry" for future employers. *See First State Bank of Corpus Christi v. Ake*, 606 S.W.2d 696, 701–02 (Tex. Civ. App.—Corpus Christi 1980, writ ref'd n.r.e.).

In sum, Texas courts have routinely applied the negligent-publication rule to hold defendants liable for acts that inherently convey a non-privileged message. *E.g., Glover*, 880 S.W.2d at 119–20. By contrast, Frakes would have us expand the rule to impose liability based upon an employer's privileged

message, simply because the privileged third-party recipient *independently* repeated the message to others. We can find no authority to support this proposition in the employment context.[6] *See Ehrhardt*, 220 F.Supp.2d at 656–58 (finding an employer's initial statement protected by the qualified privilege, even though individual employees later repeated the statement improperly). Accordingly, the district court did not err in granting summary judgment against Frakes' theory of negligent communication.

## IV

For the foregoing reasons, the judgment of the district court is AFFIRMED.

---

[6] Frakes' reliance on two cases involving medical reporting is misplaced. *See Wheeler v. Methodist Hosp.*, 95 S.W.3d 628, 639–40 (Tex. App.—Houston [1st Dist.] 2002, no pet.); *Stephan v. Baylor Med. Ctr.*, 20 S.W.3d 880, 888–89 (Tex. App.—Dallas 2000, no pet.). In both cases, hospitals sent defamatory reports to the National Practitioner Data Bank ("NPDB"), an organization that collects and disseminates allegations of physician misconduct. *See Stephan*, 20 S.W.3d at 888. Because the hospitals created the reports "with full knowledge of how the information would be used and potentially disseminated by the NPDB," the courts held the hospitals should be liable for the subsequent publications. *See id*. at 889. We conclude that the clear distinction here—between, on the one hand, a privileged statement made to an employee and, on the other, a defamatory report provided to an organization with a *statutory duty* to disseminate that report—renders the cited cases inapposite.