**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

United States Court of Appeals
Fifth Circuit

**F I L E D**
February 22, 2013

No. 11-10649

Lyle W. Cayce
Clerk

MID-CONTINENT CASUALTY COMPANY,

Plaintiff-Appellee

v.

ELAND ENERGY, INC.; SUNDOWN ENERGY LP,

Defendants-Appellants

---

ELAND ENERGY, INC.; SUNDOWN ENERGY, L.P.,

Plaintiffs - Appellants

v.

MID-CONTINENT CASUALTY COMPANY

Defendant - Appellee

Appeal from the United States District Court
for the Northern District of Texas

No. 11-10649

Before JOLLY, JONES, and GRAVES, Circuit Judges.

EDITH H. JONES, Circuit Judge:

The principal issue raised in this appeal is whether an insurer breaches a duty to its insured in Texas by surreptitiously attempting to settle a covered third-party claim and truncating its duty to defend, despite paying the full limits of its coverage. According to appellant Sundown[1], Mid-Continent Casualty Company ("Mid-Continent") prematurely tendered the limits of Sundown's primary and umbrella policies ($6 million total) while undercutting Sundown's ability to defend a class action suit for environmental damage following Hurricanes Katrina and Rita. After extensive litigation, the district court overturned a jury verdict for Sundown and awarded Mid-Continent judgment as a matter of law. For the following reasons, we AFFIRM.

## BACKGROUND

Sundown's oil and gas production facilities in Louisiana were destroyed and tanks containing crude oil spilled their contents after Hurricane Katrina hit Port Sulphur. Less than a month later, the storm surge from Hurricane Rita caused that oil to escape a containment boom constructed during Hurricane Katrina cleanup operations. Sundown held a commercial general liability policy ("Primary Policy") and an Umbrella Policy through Mid-Continent Casualty Company. The Primary Policy had coverage limits of $1 million per occurrence and $2 million total, and included a duty to defend. The Umbrella Policy had a total limit of $5 million and included a right to associate with an underlying insurer and the insured to defend.[2]

---

[1] Eland Energy, Inc. and Sundown Energy LP are sister companies and are referred to here collectively as "Sundown."

[2] The policies granted Mid-Continent broad discretion to settle.

2

No. 11-10649

Five lawsuits were filed against Sundown by neighboring property owners and commercial fishermen affected by the spillage of oil.[3] Mid-Continent agreed to provide a defense to the class action lawsuits subject to a reservation of rights. Sundown asserted that the reservation of rights created a conflict that entitled it to independent counsel. Mid-Continent eventually agreed that Sundown could be represented by Jones, Walker, Waechter, Poitevent, Carrère & Denègre, L.L.P. ("Jones Walker"). Mid-Continent tendered the Primary Policy and Umbrella Policy limits to Sundown for cleanup costs on March 22, 2006 and August 18, 2006, respectively. Sundown refused to deposit the checks because it planned to pursue reimbursement for government-mandated cleanup costs from a statutory fund and because of concern that, if Mid-Continent paid for Sundown's cleanup costs, Mid-Continent would have no duty to defend Sundown in the class action lawsuits.

Mid-Continent filed suit for a declaratory judgment that it had no further duty to defend, and Sundown filed a cross-claim for breach of the duty of good faith and fair dealing, among other cross-claims. In three opinions, the district court granted Mid-Continent the declaratory relief it sought and judgment on several of Sundown's claims.[4] The district court granted summary judgment to Mid-Continent on Sundown's claim in the alternative that Louisiana law provided a remedy for its bad faith claims in *Mid-Continent I*, a decision Sundown appeals. Sundown's counterclaims remaining after *Mid-Continent I*,

---

[3] Only one of those cases, *Blanchard*, a class action lawsuit, is at issue here.

[4] The district court ruled in *Mid-Continent I* that Mid-Continent exhausted the limits of the Primary Policy when it tendered the $1 million check to Sundown. *Mid-Continent Cas. Co. v. Eland Energy, Inc.*, Nos. 3:06cv1576, 3:06cv1578, 2009 WL 3074618, at *11–12 (N.D. Tex. Mar. 30, 2009). The district court ruled in *Mid-Continent II* and *III* that Mid-Continent exhausted the limits of the Umbrella Policy when it tendered the $5 million check to Sundown. *Mid-Continent Cas. Co. v. Eland Energy, Inc.*, Nos. 3:06cv1576, 3:06cv1578, slip op. at 25 (N.D. Tex. Oct. 22, 2009); *Mid-Continent Cas. Co. v. Eland Energy, Inc.*, Nos. 3:06cv1576, 3:06cv1578, 2010 WL 610713, at *1 (N.D. Tex. Feb. 22, 2010).

No. 11-10649

*II*, and *III* were tried to a jury, which returned a verdict partially in favor of Sundown and awarded Sundown a total of $8.45 million in compensatory, penalty, and punitive damages. Mid-Continent sought judgment as a matter of law. The district court granted Mid-Continent's motion, overturning the jury verdict. *Mid-Continent Cas. Co. v. Eland Energy, Inc.*, 795 F. Supp. 2d 493 (N.D. Tex. 2011) (*Mid-Continent IV*). Sundown appealed.

Sundown's appeal turns on actions taken by Mid-Continent, including a secret offer of settlement made to Chris Leopold, which it says prejudiced its ability to settle the *Blanchard* class action. Leopold owned the largest piece of property near Sundown's facility. Leopold also owned a store and a boat storage shed on that property. Leopold contended that oil stains on trees on his property and the remains of his buildings were caused by oil spilled from Sundown's facility.

On September 23, 2005, within weeks of the hurricanes' destruction, Sundown notified Mid-Continent that it had been served in the *Blanchard* litigation.[5] Property owners near Sundown's facilities alleged that their properties had been contaminated with crude oil from Sundown's facilities. The class action named Sundown as the sole defendant.[6] Mid-Continent hired attorneys Tony Clayton and Paul Preston to defend Sundown. Representatives of Sundown, representatives of Mid-Continent, lawyers from Jones Walker, Clayton, and Preston met on October 7. The parties agreed that any visit to the Sundown facility or surrounding properties would be coordinated through Jones Walker. The parties also agreed to coordinate legal issues through Jones Walker.

---

[5] Leopold was not a member of the putative *Blanchard* class at that time.

[6] Around this time Sundown also notified Mid-Continent that it had been named as a defendant in two other lawsuits.

4

No. 11-10649

What followed next in the claims handling Sundown succinctly characterizes as "the extreme acts of Mid-Continent with respect to Leopold—the secret visit, secret investigation, secret sampling and secret offer" that consciously undermined Sundown's defense of the *Blanchard* case.

Preston emailed a Jones Walker attorney, Carl Rosenblum, on October 11, 2005, about arranging a site visit. Rosenblum replied the next day that he would not be available until the first week of November. Later, Rosenblum informed Preston that they could visit the site on October 27, but he reversed course on October 24, telling Preston that a visit by Preston would be "unnecessary and inappropriate" because Sundown insisted on choosing its own counsel in response to Mid-Continent's reservation of rights.

Unknown to Rosenblum, Preston had already arranged a meeting with Leopold for October 24. Leopold showed Preston and other Mid-Continent representatives the remnants of oil on his property, but they did not talk about money or engage in settlement negotiations. While touring Leopold's property, another nearby property owner, Ben Slater, approached Preston and briefly spoke to him. Preston did not visit the Sundown facility. Sundown first learned of Preston's visit on November 11, during a conversation between a Jones Walker attorney and Slater.

On November 29, Luther Holloway visited Leopold's property on Mid-Continent's behalf. Holloway took pictures and made a video of the property. Mid-Continent concluded, based on Holloway's report, that Leopold's property had been stained by oil spilled from Sundown's facility. Dana Futrell was hired to replace Holloway, and he inspected Leopold's property on December 19. Futrell was also convinced that oil was present, and he hired an engineering firm to take soil samples. Two of the twenty-five samples showed petroleum

contamination, but they were from diesel, not crude oil.[7]  Sundown does not produce or store diesel.

Leopold responded to the results by indicating that he just wanted Mid-Continent to remove the parts of the building and debris that were covered in oil. Mid-Continent began putting together a settlement offer by obtaining a cleanup estimate from Greco Construction ("Greco").[8]  Greco's estimate was $98,560, but Mid-Continent subtracted the portions of the estimate that did not cover debris removal that was later performed by the government without charge.  This brought the estimate to $54,536, and Mid-Continent alleges it made a written settlement offer of that amount to Leopold on June 2, 2006.  Leopold testified that he "never got an offer in writing" and that an oral offer of "somewhere around a hundred thousand dollars" had been made, but that he rejected the offer.

Sundown learned about the soil samples at a meeting held on June 16. Sundown representatives reiterated to the Mid-Continent representatives present the need to coordinate and for Jones Walker to lead the investigation. They also discussed the three pending lawsuits and Sundown made a proposal for settlement with Mid-Continent.  Mid-Continent did not inform Sundown of its settlement offer to Leopold at that time.  Mid-Continent sent limited results from the soil sampling to Sundown later that month.

In July, Mid-Continent informed Sundown that it had extended a settlement offer to Leopold.[9]  When asked why Mid-Continent did not tell

---

[7] Errors in the soil samples were later discovered.  The errors, however, concerned the concentration of diesel, not any crude oil.  Mid-Continent still believed the staining 8–10 feet above the ground was caused by crude oil from Sundown's facility.

[8] Leopold recommended Greco.

[9] The letter was dated July 10, 2006, but Sundown contends it did not receive the letter until July 21.

No. 11-10649

Sundown about the settlement offer at the June 16 meeting, Mid-Continent Vice President Steve Haltom replied that he "didn't think it was important." Sundown demanded Mid-Continent withdraw the offer.  Mid-Continent did so that day, and Leopold promptly became a member of the *Blanchard* class action. Leopold also encouraged several of his neighbors to sue Sundown.

Sundown settled the *Blanchard* litigation for $2 million and an agreement to remediate any Sundown oil found on any class member's property.  Sundown paid for the settlement, as Mid-Continent had already tendered policy limits and withdrawn from the defense.  Sundown believed the settlement would have been smaller had an offer not been made to Leopold.

## STANDARD OF REVIEW

"[T]his court reviews *de novo* a district court's denial of a motion for . . . judgment as a matter of law, applying the same standard as the district court." *Goodner v. Hyundai Motor Co., Ltd.*, 650 F.3d 1034, 1039 (5th Cir. 2011). "We review the jury's verdict to determine if the facts and reasonable inferences point so strongly and overwhelmingly in favor of one party that reasonable minds could not arrive at a different verdict." *ARA Automotive Group v. Cent. Garage, Inc.*, 124 F.3d 720, 723 (5th Cir. 1997).  "The jury's verdict can only be overturned if there is no legally sufficient evidentiary basis for a reasonable jury to find as the jury did." *Guile v. United States*, 422 F.3d 221, 225 (5th Cir. 2005). The Fifth Circuit "review[s] *de novo* the district court's determination of state law." *Mills v. Davis Oil Co.*, 11 F.3d 1298, 1301 (5th Cir. 1994).

## DISCUSSION

Sundown is understandably upset.  The court submitted to the jury interrogatories pertaining to Mid-Continent's good faith and fair dealing "by consciously undermining Sundown's defense in the [*Blanchard* suit]" and by failing "to conduct a reasonable investigation of Sundown's Hurricane Katrina claim."  The jury returned a multimillion dollar actual and exemplary damage

verdict for Sundown.  And the court ruled after post-trial briefing for Mid-Continent as a matter of law.  On appeal, Sundown contends that the district court erred when it held that there is no cause of action under Texas common law for breach of an insurer's duty of good faith and fair dealing in the context of third-party claims; that it erred in holding that Texas rather than Louisiana law governed Sundown's claim for breach of the duty; and that it erred in holding against Sundown on its statutory claims for unfair settlement practices.

## I.     Duty of Good Faith and Fair Dealing

Sundown contends Mid-Continent breached an insurer's common law duty of good faith and fair dealing.  Sundown argues that the district court erred in interpreting two Texas decisions and a decision of this court.  *Northwinds Abatement, Inc. v. Employers Ins. of Wausau*, 258 F.3d 345 (5th Cir. 2001); *State Farm Mut. Auto. Ins. Co. v. Traver*, 980 S.W.2d 625 (Tex. 1998); *Republic Ins. Co. v. Stoker*, 903 S.W.2d 338 (Tex. 1995).  To prevail, Sundown must show that Texas law recognizes a cause of action for an insurer's mishandling of third-party claims.  The Texas Supreme Court is the principal authority on questions of Texas common law.  *Paz v. Brush Engineered Materials, Inc.*, 555 F.3d 383, 392 (5th Cir. 2009).  Lacking a decision on point, this court must make an "*Erie* guess," i.e., forecast how the Texas Supreme Court "would rule."  *Id.*  "This prediction may be based on [Texas] case law, dicta, general rules on the issues, decisions of other states, and secondary sources."  *Id.*

"Under Texas law, an insurer owes a duty of good faith in handling its insured's own claim of loss."  *Med. Care Am., Inc. v. Nat'l Union Fire Ins. Co.*, 341 F.3d 415, 425 (5th Cir. 2003).  Sundown sought coverage, however, for a third-party claim covered by its comprehensive general liability policy.  *See Lamar Homes, Inc. v. Mid-Continent Cas. Co.*, 242 S.W.3d 1, 17 (Tex. 2007) (("[A] first party claim is stated when 'an insured seeks recovery for the insured's own loss,' whereas a third-party claim is stated when 'an insured seeks coverage for

No. 11-10649

injuries to a third party.'" (quoting *Universal Life Ins. Co. v. Giles*, 950 S.W.2d 48, 54 n.2 (Tex. 1997))). There exists no statutory cause of action for breach of the duty of good faith and fair dealing in the context of an insurer's handling of a third-party claim. The only previously recognized common law claim is for breach of the duty to settle a third-party claim within policy limits. *Stowers Furniture Co. v. Am. Indem. Co.*, 15 S.W.2d 544 (Tex. 1928); *see, e.g.*, *Mid-Continent Ins. Co. v. Liberty Mut. Ins.*, 236 S.W.3d 765, 776 (Tex. 2007) (holding that insurer's common law duty to act reasonably when handling insured's defense is limited to its *Stowers* duty.)

Sundown argues that the Texas Supreme Court, in *Traver* and *Stoker*, expanded an insurer's duties in two ways beyond that defined by *Stowers*. In *Traver*, the court hinted that an insurer also might be liable if it "consciously undermined the insured's defense." *Traver*, 980 S.W.2d at 629. In *Stoker*, the court stated that "as a general rule there can be no claim for bad faith when an insurer has promptly denied a claim that is in fact not covered" but the court did "not exclude, however, the possibility that in denying the claim, the insurer may commit some act, so extreme, that would cause injury independent of the policy claim." *Stoker*, 903 S.W.2d at 341 (citations omitted).[10]

Neither of these passages established Texas law. *Traver* specifically held that an insurer is not vicariously liable for the malpractice of an attorney the insurer provides the insured. *Traver*, 980 S.W.2d at 629. The *Traver* court's "consciously undermined" language notwithstanding, the insured did not appeal the lower court's denial of his breach of duty of good faith and fair dealing claim and thus the lower court's decision was final. *Id.* As the issue was not before it,

---

[10] Note that *Stoker* is premised on denial of coverage at the outset, whereas here, Mid-Continent paid Sundown the full policy limit.

the Supreme Court's musings on the subject were dicta.[11]   The statement in *Stoker* is dicta, as it did "not exclude [a] possibility." *Stoker*, 903 S.W.2d at 341.[12]

Sundown contends that the *Stoker* and *Traver* statements constitute "plain unconditioned statement[s]" and "considered dictum" that this court is obliged to follow. *Thomas v. Hoffman-LaRoche, Inc.*, 949 F.2d 806, 812 (5th Cir. 1992), *cert. denied*, 504 U.S. 956 (1992).  But this is neither a new issue that Texas courts have not yet had the opportunity to address or a novel issue that they are unlikely to confront.  The *Stoker* language has frequently been discussed, but in seventeen years since the decision appeared, no Texas court has yet held that recovery is available for an insurer's extreme act, causing injury independent of the policy claim, in the first-party claim context, let alone in the third-party claim context.  Such case history does not a yield a sound foundation for an *Erie* guess, nor does the failure of state courts in the past fourteen years to apply or even discuss the *Traver* language.

Sundown's final attempt to support its novel claim rests on the Fifth Circuit's application of the *Stoker* language in *Northwinds*.  258 F.3d at 352–53. In *Northwinds* this court, in affirming a jury verdict on *statutory* claims for violations of the Texas Deceptive Trade Practices Act and the Texas Insurance

---

[11] Not only has *Traver*'s dicta not been relied upon by Texas lower court cases, but in fact, the "consciously undermined" language has only been *mentioned* in one decision.  *See Southstar Corp. v. St. Paul Surplus Lines Ins. Co.*, 42 S.W.3d 187, 192 (Tex. App.—Corpus Christi 2001, no pet.).

[12] Courts have frequently recognized the relevant language from *Stoker* as dicta.  *See, e.g.*, *Gen. Star Indem. Co. v. Sherry Brooke Revocable Trust*, 243 F. Supp. 2d 605, 612 (W.D. Tex. 2001) ("[The insureds] hang their extra-contractual claims on a single line of dictum in *Stoker*"); *Potomac Ins. Co. v. Woods*, No. 1:95cv469, 1996 WL 450687, at *6 (E.D. Tex. July 22, 1996) ("In dicta the [*Stoker*] court left open the theoretical possibility that in a case in which the insurer has no liability under the policy there could be a bad faith claim."); *SnyderGeneral Corp. v. Century Indem. Co.*, 907 F. Supp. 991, 1006 (N.D. Tex. 1995) ("[T]he [*Stoker*] court also said, albeit in dicta, that there are exceptions [to the general rule]"), *aff'd in part and vacated in part on other grounds*, 113 F.3d 536 (5th Cir. 1997); *Toledo-Lucas Cnty. Port Auth. v. Axa Marine & Aviation Ins. Ltd.*, 220 F. Supp. 2d 868, 874 n.7 (N.D. Ohio 2002) (noting that the *Stoker* language is dicta), *rev'd on other grounds*, 368 F.3d 524 (6th Cir. 2004).

No. 11-10649

Code, approvingly cited the *Stoker* language and held that a reasonable jury could have found the defendant's "successful efforts to persuade the [insurer] to sue [its insured] baselessly" were sufficiently extreme and caused Northwinds to pay significant defense costs. *Id.* The district court explained at length, however, and we need only summarize its reasoning, why *Northwinds* is inapposite. First, the judgment in *Northwinds* arose from breaches of statutory provisions, and the court stated there had been no breach of contract or of good faith and fair dealing. The court's citation to *Stoker* referred only to those statutory claims, a different proposition than creating an exception to the general rule that there is no claim for breach of good faith and fair dealing in the third-party claims-handling process. Second, if *Northwinds* articulates a liability standard based on *Stoker*'s dicta, it is at odds with later Texas court decisions, including two Texas Supreme Court opinions, that uniformly fail to apply *Stoker*'s language as a concrete cause of action.[13] This court must, in a diversity case, "follow subsequent state decisions that are clearly contrary to a previous decision of [the Fifth Circuit]." *Farnham v. Bristow Helicopters, Inc.*, 776 F.2d 535, 537 (5th Cir. 1985). If *Northwinds* approved a "*Stoker* claim," this court's decision has not withstood the test of subsequent state court decisions.[14]

---

[13] *Progressive Mutual Insurance Co. v. Boyd*, 177 S.W.3d 919, 922 (Tex. 2005), and *Am Motorists Insurance Co. v. Fodge*, 63 S.W.3d 801, 804 (Tex. 2001), treat the *Stoker* language as admitting a mere "possibility" accompanied by no examples (nor any mention of *Northwinds*). *See also Laas v. State Farm Mut. Auto. Ins. Co.*, No. 14-99-194cv, 2001 WL 1479228, at *4 (Tex App.—Hous. Nov. 1, 2001, no pet.) ("Indeed, the supreme court in *Stoker*, mentioned in dicta the possibility, that in denying a claim, an insurer might commit some act, so extreme, there could be an injury independent of the policy claim."); *Gates v. State Farm Cnty. Mut. Ins. Co. of Tex.*, 53 S.W.3d 826, 831–32 (Tex. App.—Dallas 2001, no pet.); *Crocker v. Am. Nat'l Gen. Ins. Co.*, 211 S.W.3d 928, 936 (Tex. App.—Dallas 2007, no pet.).

[14] This court later held, while discussing Texas law and without citing *Northwinds*, that "[A]n insured . . . has no claim for bad faith premised on the insurer's investigation or defense of a claim brought against it by a third party. This is because 'an insured is fully protected . . . by his contractual and *Stowers* rights' . . ." *Med. Care Am., Inc. v. Nat'l. Union Fire Ins. Co.* 341 F.3d 415, 425 (5th Cir. 2003) (citations omitted).

11

Finally, *Northwinds* is in any event factually distinguishable from the present case. The claim in *Northwinds* sought recovery of the cost of defending a baseless lawsuit instigated against Northwinds at the defendant's behest; the lawsuit had nothing to do with the defendant's mishandling of workers' compensation claims as a servicing agent for Northwinds. Here, Sundown's claim is inextricably tied to Mid-Continent's mishandling of a third-party claim under the insurance policies and Mid-Continent's motive to minimize its costs associated with the policies. *Northwinds* accords with any extra-contractual cause of action that the *Stoker* language might suggest, but in this case the "extreme" acts are subsumed within the claims-handling process, and they did not inflict injury independent from the policy claim.[15]

## II.   Choice of Law

The district court ruled in *Mid-Continent I* that Texas law applied and granted Mid-Continent's motion for summary judgment on Sundown's alternative claims under Louisiana law. 2009 WL 3074618, at *94–95.[16] Sundown had asserted an extra-contractual claim for breach of the duty of good faith and fair dealing under Louisiana law based on Mid-Continent's "failure to inform Sundown regarding its contacts and settlement overtures" and its "unreasonable settlement offer to a single member of the *Blanchard* putative class action." The "most significant relationship" test from § 6 of the Restatement (Second) Conflict of Laws is used by Texas courts and governs this diversity case. *Spence v. Glock, GmbH*, 227 F.3d 308, 311 (5th Cir. 2000).

---

[15] Because the above grounds are sufficient, we do not reach Sundown's other arguments on this issue or the district court's other grounds for holding for Mid-Continent.

[16] "This court reviews the district court's grant of summary judgment *de novo*, applying the same standards as the district court. Summary judgment is warranted if 'the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law." *DePree v. Saunders*, 588 F.3d 282, 286 (5th Cir. 2009) (internal citations omitted).

No. 11-10649

Section 6 of the Restatement begins: "(1) A court ... will follow a statutory directive of its own state on choice of law." Mid-Continent argues that Article 21.42 of the Texas Insurance Code mandates the application of Texas law to disputes over insurance contracts payable to a citizen or inhabitant of Texas.[17] Sundown counters, however, that Texas and Louisiana courts treat breaches of the duty of good faith and fair dealing as tort, not contract claims. We assume *arguendo* that Article 21.42 is not facially applicable. Consequently, the factors listed under § 6(2) must be considered:

> (2) When there is no such directive, the factors relevant to the choice of the applicable rule of law include
> (a) the needs of the interstate and international systems,
> (b) the relevant policies of the forum,
> (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,
> (d) the protection of justified expectations,
> (e) the basic policies underlying the particular field of law,
> (f) certainty, predictability and uniformity of result, and
> (g) ease in the determination and application of the law to be applied.

Under § 145 of the Restatement (Second) Conflict of Laws, the

> (2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:
> (a) the place where the injury occurred,
> (b) the place where the conduct causing the injury occurred,
> (c) the domicil, residence, nationality, place of incorporation and place of business of the parties, and
> (d) the place where the relationship, if any, between the parties is centered.

---

[17] The statutory directive in Article 21.42 states:
Any contract of insurance payable to any citizen or inhabitant of this State by any insurance company or corporation doing business within this State shall be held to be a contract made and entered into under and by virtue of the laws of this State relating to insurance, and governed thereby, notwithstanding such policy or contract of insurance may provide that the contract was executed and the premiums and policy (in case it becomes a demand) should be payable without this State, or at the home office of the company or corporation issuing the same.

Section 145 lists contacts because the "states which are most likely to be interested are those which have one or more of the contacts with the occurrence and the parties." Restatement (Second) Conflict of Laws § 145 cmt. (e). Here, the conduct causing Sundown's alleged injury partially occurred in Louisiana. Nevertheless, the other relevant contacts point toward Texas. Sundown is a Texas business. Under Article 21.42 of the Texas Insurance Code, the policies are governed by Texas law, and thus the relationship between the parties is centered in Texas. Sundown's insurance agent prepared its notice of claim in Texas. Mid-Continent sent Sundown payment under the policies to Texas. The parties' meetings regarding the handling of the claims were held in Texas.

Not only do the parties' relevant contacts with Texas predominate, but the "relevant policies" of Texas and Louisiana militate toward applying the law of Texas. The basic legal question is whether, or to what extent, the insurer had a duty to handle third-party claims without disadvantaging its insured notwithstanding that it reimbursed the insured up to the policies' full limits. The insurance contract is governed by Texas law. Both Texas and Louisiana, like all other states, have regulatory agencies and specific law devoted to the business of insurance. Even though an extra-contractual claim may not fall within the parameters of express Texas regulation, the regulating state is vitally concerned, because such claims, whether successful or not, bracket its efforts and may reveal the need for additional or different regulation. Allowing judge-made torts like breach of good faith, to superimpose another state's standards on Texas regulation undermines it, furnishes no predictability for the state's insurers, and guarantees inconsistent outcomes for insureds with Texas policies. Thus, although the "protection of justified expectations"; the "certainty, predictability and uniformity of result"; and the "ease of determination and application of the law to be applied" are typically given less weight in tort actions, *id.* cmt. (a)-(c), those policies weigh heavily here, where the cause of

14

action, although resting in tort, could not exist but for the insurance policies. Accordingly, Texas law applies.[18]

## III. Statutory Claims for Unfair Settlement Practices and Misrepresentations

The jury found that Mid-Continent committed five separate violations of the Texas Insurance Code, and it awarded $2 million compensatory damages for Sundown's alleged injury in settling the *Blanchard* case. The district court granted judgment as a matter of law for Mid-Continent on all of these claims. On appeal, Sundown defends the verdict only as to two: Mid-Continent's failure to give a prompt and reasonable explanation for the Leopold settlement offer, Tex. Ins. Code § 541.060(a)(3); and Mid-Continent's four misrepresentations of material facts, Tex Ins. Code § 541.060.[19]

The parties dispute whether the trial court correctly overturned the verdict finding that Mid-Continent delayed too long and then failed reasonably to explain its settlement offer to Leopold in July, 2006. On the other hand, Mid-Continent does not challenge the finding of four material misrepresentations presented to the jury: (1) Mid-Continent misstated the law to Sundown when it denied that a conflict of interest was created by its reservation of rights letters; (2) Mid-Continent misrepresented that it did not pay more than $200/hour for Louisiana attorneys (and hence would not pay more for Sundown's separate counsel); (3) Mid-Continent misstated that there was no coverage for Hurricane Katrina costs at Sundown's facility unless Sundown obtained a written order from the Coast Guard; and (4) Mid-Continent misstated the law when it

---

[18] We do not decide whether Louisiana law does in fact recognize a cause of action for breach of a duty of good faith and fair dealing in these circumstances.

[19] Section 541.060 of the Texas Insurance Code states: "(a) It is an unfair method of competition or an unfair or deceptive act or practice in the business of insurance to . . . misrepresent[ ] to a claimant a material fact or policy provision relating to coverage at issue."

15

maintained it had an unavoidable duty to investigate the Leopold claim. The district court held as a matter of law that none of these unfair settlement practices was a producing cause of Sundown's injury in the amount of the *Blanchard* settlement. We agree. Again, we may summarize the district court's more comprehensive explanation.

"A producing cause is an efficient, exciting, or contributing cause, which in a natural sequence, produced the injuries or damages complained of, if any." *Gabriel v. Lovewell*, 164 S.W.3d 835, 844 (Tex. App.—Texarkana 2005, no pet.) (citations and internal quotation marks omitted). "[P]roducing cause requires a lesser burden than proximate cause because it does not require foreseeability." *Id.* There must, however, be a showing of cause in fact, which "requires evidence that allows the fact finder to reasonably infer that the damages are a result of the defendant's conduct." *2 Fat Guys Inv., Inc. v. Klaver*, 928 S.W.2d 268, 272 (Tex. App.—San Antonio 1996, no writ). The "plaintiff must show an unbroken causal connection between the alleged misrepresentation and injuries suffered by the complaining party." *Travelers Indem. Co. v. Page & Assocs. Constr. Co.*, No. 07-01-22cv, 2002 WL 1371065, at *9 (Tex. App.—Amarillo June 25, 2002, pet. denied) (citing *Doe v. Boys Club of Greater Dall., Inc.*, 907 S.W.2d 472, 481 (Tex. 1995)).

The jury found that Mid-Continent violated § 541.060(a)(3) of the Texas Insurance Code by failing to provide notice of its offer of settlement within ten days and failing to explain it reasonably. Sundown devoted considerable energy at trial to attempting to show that it was injured because the Leopold offer was *made*,[20] the offer was excessive, and it was not communicated to Sundown for over a month. Moreover, Mid-Continent's explanation was unreasonable because the offer was not justifiable based on expert reports concerning

---

[20] Mid-Continent had the right under the policy to settle claims without Sundown's consent.

Leopold's damage. Critically, Sundown did not adduce evidence that *had* Mid-Continent provided notice within ten days and had it furnished all its expert reports to Sundown, Leopold could have been persuaded not to join the *Blanchard* class, not to become a class representative, and not to discuss his claim with other property owners. Sundown's brief asserts that the statutory violation "prevented Sundown from taking measures to mute the effect of the offer immediately after it was made," but no evidence supports that earlier notification to Sundown would have made any difference in the discussions with Leopold. A producing cause cannot be based on speculation.

Sundown's proof of producing cause is also lacking for each of Mid-Continent's misrepresentations. First, Mid-Continent misstated the law when it failed to acknowledge a conflict of interest created by its reservation of rights letters. Sundown does not put forth any explanation for how the lack of acknowledgment by Mid-Continent of a conflict of interest led to a more costly settlement of the *Blanchard* litigation. Instead, Sundown frames the misstatement as part of Mid-Continent's general behavior and tactics in its dealings with Sundown. Even assuming the misstatement was part of a larger scheme, Sundown draws no direct connection between this misstatement and the harm it suffered.

Next Mid-Continent misrepresented that it did not pay more than $200 per hour for Louisiana lawyers, But Sundown does not show how Mid-Continent's misrepresentation affected its choice of attorneys or their utilization. Sundown was still able to hire the attorneys of its choice, albeit at reduced rates. Instead, Sundown paints the misrepresentation as part of Mid-Continent's scheme to stymie Sundown and again fails to show any direct connection between Mid-Continent's misrepresentation and the amount it paid to settle the *Blanchard* case.

17

The jury also found that Mid-Continent misstated the law when it told Sundown there was no coverage for Hurricane Katrina cleanup costs at Sundown's facility unless Sundown could produce a written order from the Coast Guard.  This led Sundown to seek reimbursement for cleanup costs from a government fund and use its policy coverage instead for litigation.  Sundown contends Mid-Continent responded with a secret plan to exhaust its policy limits as quickly as possible to minimize defense costs.  Sundown goes beyond mere conjecture about an overall scheme and offers a theory showing a direct line from Mid-Continent's misrepresentation to Sundown's injury.  Sundown did not, however, adduce sufficient evidence that Mid-Continent's misrepresentation caused Sundown to incur the $2 million *Blanchard* settlement.  Before the attempt to hold its cleanup claims "in abeyance," Sundown had submitted such extensive invoices for cleanup costs that Mid-Continent tendered the policy limits for excess coverage to Sundown in August of 2006.  The district court held in *Mid-Continent I* that Mid-Continent's duty to defend suits arising out of Hurricane Katrina ended on March 22, 2006, when Mid-Continent tendered the $1 million check on the primary coverage to Sundown.  Accordingly, Mid-Continent's misstatement could not have been a producing cause of any increased settlement cost.

Last, the jury found Mid-Continent misstated the law when it maintained that it had an unavoidable duty to investigate Leopold's claim.  Sundown contends this misstatement led to Mid-Continent's secret site visit, which led to the offer to Leopold, which in turn led to the increased settlement.  Sundown draws a connection between the misstatement and its harm, but that causal connection fails in its first step.  Sundown proved only that it was harmed by Mid-Continent's conduct of the *investigation*, not its *misstatement* that it had a duty to investigate.

18

To defeat the district court's ruling,  Sundown needed to successfully tie only one misrepresentation by Mid-Continent to the increased settlement amount and establish that it was a producing cause.  It is not enough to merely show that Mid-Continent was a bad actor.  Sundown devotes twelve pages of its principal brief to this issue without attempting to tie the misrepresentations found by the jury  to the increased settlement.  Instead, Sundown argues that it was injured by the Leopold offer and related actions, none covered by the jury's misrepresentation findings, that led to inflated expectations and the inflated *Blanchard* settlement.  The evidence does not establish that any of Mid-Continent's misrepresentations were the producing cause of an increased settlement for the *Blanchard* litigation.

The district court's judgment is **AFFIRMED**.